UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NICOLE LYN KOZAL,

      Plaintiff,

v.

CHIPPEWA COUNTY, MICHAEL
D. BITNAR, in his official capacity,
AMANDA VAUGHN, SHADOW
LUZIER, LINDY WAITE and
AARON KINSELLA, in their individual
capacities,

      Defendants.

Case No. 21-
Hon.

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

_____/
JENNIFER G. DAMICO (P51403)
BUCKFIRE LAW FIRM
Attorneys for Plaintiff
29000 Inkster Road, Suite 150
Southfield, Michigan 48034
(248) 569-4646
Fax (248) 569-6737
jennifer@buckfirelaw.com
_____/

NOW COMES Plaintiff, NICOLE LYN KOZAL, through her attorneys,

Buckfire Law Firm, and for her Complaint against the above-named Defendants,

states as follows:

1.      This is an action brought by Plaintiff for money damages pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, against Defendants, Chippewa County, Michael D. Bitnar, in his official capacity, Amanda Vaughn, Shadow Luzier, Lindy Waite and Aaron Kinsella, in their individual capacities, and state law claims against all Defendants.

2.      This court has jurisdiction over Plaintiff's 42 U.S.C. §§ 1983 and 1988 claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      This court has jurisdiction over Plaintiff's state law claims pursuant to Federal Rule of Civil Procedure 18 and 28 U.S.C. § 1367.

4.      Venue lies in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b).  The unlawful actions alleged in this Complaint took place within the City of Sault Ste. Marie, in Chippewa County, located within the Northern Division of the Western District of Michigan.

## PARTIES

5.      Plaintiff, Nicole Lyn Kozal ("Kozal" or "Plaintiff" hereinafter), at all times relevant to this action is, and was, a resident of the City of Sault Ste. Marie, Chippewa County, State of Michigan.

6.      Defendant, Chippewa County ("County" hereinafter) is a Michigan municipal corporation and is the body responsible for the control and oversight of

its departments, agencies and facilities, including the Chippewa County Sheriff Department, as well as its deputies and detention or corrections officers, including Defendants, Michael D. Bitnar, Amanda Vaughn, Shadow Luzier, Aaron Kinsella, and Lindy Waite.

7.      Defendant, Michael D. Bitnar ("Bitnar"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Bitnar is sued in his official capacity as the Chippewa County Sheriff, and final policy- maker, employed by the Defendant County and/or the Chippewa County Sheriff Department ("Department" hereinafter).

8.      Defendant, Amanda Vaughn ("Vaughn"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Vaughn is employed by the Defendant County as a sworn detention deputy, was in the scope of her employment, and is being sued in her individual capacity.

9.      Defendant, Shadow Luzier ("Luzier"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Luzier is employed by the Defendant County as a sworn detention deputy, was in the scope of her employment, and is being sued in her individual capacity.

10.     Defendant, Aaron Kinsella ("Kinsella"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Kinsella is employed

by the Defendant County as a sworn detention deputy, was in the scope of his employment, and is being sued in his individual capacity.

11.    Defendant, Lindy Waite ("Waite"), is and at all times relevant to this action was, a resident of the State of Michigan.  Defendant Waite is employed by the Defendant County as a sworn police officer, was in the scope of her employment, and is being sued in her individual capacity.

12.    Defendants, Bitnar, Vaughn, Luzier, Kinsella and Waite, at all times relevant to this action, were acting under the color of state law in their capacities of Chippewa County Sheriff and Sheriff deputies.

13.    On June 13, 2020, the individual Defendant deputies were on duty and acted in concert with each other to cause the violations of Plaintiff's civil rights and then conspired to distort and conceal the actual facts and circumstances surrounding the events described in detail herein.

14.    The individual Defendants acted mutually to achieve the resulting injuries and damages to Plaintiff.

15.    Kozal was wrongfully arrested, detained and strip searched on June 13, 2020, and as a result suffered physical and emotional pain and suffering, including fright, shock, humiliation, shame, loss of social pleasures and enjoyment, and loss of reputation and economic damages as more fully described herein.

16.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendants are liable to Plaintiff for all damages allowable under federal law, including all damages stated in Paragraph 15, punitive damages against the individual Defendants, and costs, interest and attorney fees against all Defendants.

## SPECIFIC ALLEGATIONS

17.     Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.

18.     On June 13, 2020, at approximately 1:20 a.m., Kozal was stopped on Lakeshore Drive in Sault Ste. Marie, by Bay Mills Tribal Police Sergeant Michael Parish ("Parish"), for allegedly driving 45 in a 35-m.p.h. zone.[1]

19.     Plaintiff denied the allegation and maintained that she was merely making a turn-around in the casino parking lot on Lakeshore Drive after missing her turn on her way home from her office.

20.     Parish told investigators that he radioed for back-up because he could tell she was going to be a problem and "started demeaning me right away."

21.     Parish further told investigators that he thought he smelled alcohol on her breathe, even though she was wearing a mask.

22.     Parish further stated that "she was sweating profusely" and her eyes were dilated.

---

[1] The ticket his issues states she was going 40 in a 35-m.p.h zone.

23.     The audio and video recording from his body worn camera ("BWC") is inconsistent with the statements Parish made to investigators.

24.     Chippewa County deputy Waite, and Bay Mills Tribal Police Officer, Colton Cameron ("Cameron"), who were at the Bay Mart, joined him at the scene.

25.     Parish asked Kozal if she had been drinking.  She told him no and that she was allergic to alcohol.

26.     Upon information and belief, Kozal told the officers that she worked as a victim's advocate for the Sault Tribe and that she had been working at her office to complete a paper for her master's degree program at Michigan State University.

27.     Kozal told them she was tired from writing her paper all day and night.[2]

28.     Parish told Kozal if she consented to a preliminary breath test ("PBT") and if the result came back negative, he would release her to go home.

29.     Kozal agreed.

30.     Kozal took two (2) roadside PBT's, and both came negative for alcohol registering ".000" on the device.

31.     Despite his promise to let her leave, Parish then asked if "she was on any substances."

---

[2] Her paper was submitted via electronic submission at 12:43 a.m., on June 13, 2020.

32.     Kozal stated that she was prescribed .05 milligrams of Klonopin for anxiety, and from the BWC, she is seen and heard showing Parish her medication bottle.

33.     Kozal further told Parish that she last took her medication on June 11, 2020 between 4:00 p.m. and 6:00 p.m.

34.     At that point, audio from the BWC captured Defendant Waite, saying: "I'd do an ARIDE on her."[3]

35.     From the BWC audio, neither officer Cameron or Parish was qualified to perform the field sobriety testing ("FST").  Deputy Waite volunteered.

36.     Kozal asked Parish to see the radar "gun" as she did not believe that she was speeding.

37.     Parish ignored Kozal.

38.     The weather at 1:00 a.m. on June 13, 2020 in Sault Ste. Marie was 36 degrees Fahrenheit.[4]

39.     Kozal can be seen visibly shivering from the cold temperature as she was wearing sandals and no jacket.

---

[3] ARIDE stands for Advanced Roadside Impaired Driving Enforcement. It is a controversial roadside field sobriety test to assist an officer in making an educated guess as to what drug the suspect may have taken. It is unknown if Deputy Waite was qualified to perform the advanced testing.

[4] https://www.timeanddate.com/weather/@5009004/historic?month=6&year=2020

40.    Kozal was also visibly upset because she had "passed" the PBT's and was not allowed to leave, as promised by Parish.

41.    At that point, knowing that she had consumed no alcohol or drugs, prescription or illegal, Kozal requested a blood test.

42.    Waite, Parish and Cameron, acting together, refused to allow Kozal to leave or to take her for a blood or urine test that would have conclusively determined whether she had drugs in her system.

43.    Instead, Waite decided to perform a series of FST's on Kozal in front of her fellow officers.

44.    Kozal complied.

45.    During the testing, Kozal complained to Waite that she was "freezing" and that was why she was shivering.

46.    Waite said "I know your feet are cold," and "I know it's cold out."

47.    Kozal pointed out that Waite was also shivering in the cold.

48.    Kozal was further upset because Waite refused to wear a mask.

49.    The red and blue strobe lights from the cruisers were flashing in Kozal's face.

50.    From Waite's BWC, Kozal can be seen performing the tests without difficulty.

51.     For the final test, Waite had Kozal perform the "Romberg Balance" test where Kozal was instructed to stand with her feet together, tilt her head back, and close her eyes and count in her head to 30 seconds.  When Kozal believed that 30 seconds had elapsed, Waite instructed her to tilt her head forward, open her eyes and say "stop."[5]

52.     Waite had Kozal perform the test two times.

53.     Kozal did not sway or wobble during either test.

54.     Waite stated: "Ok, *due to the results of that test*, I have some concerns making sure you are able to drive."

55.     Waite told Kozal that on both attempts, she only counted to 23 seconds.

56.     Kozal objected stating that she counted seconds slower than Waite who was using her phone as a timer.

57.     Kozal was arrested.

58.     Waite told investigators that Kozal "failed *all* the tests" when a review of Waite's BWC clearly shows that Waite's statement was untrue.

59.     Kozal again asked for a blood test, and Waite, Parish and Cameron complied.

---

[5] This test has not been standardized by any agency or the National Highway Traffic Safety Administration.  The lack of standardization makes the test and the testing process unreliable, irregular and subject to challenge.

60.     Prior to being placed in the cruiser, Waite stated that she was going to conduct a "pat down" and asked if Kozal had any weapons, drugs or objects on her stating: "I don't believe you do, but I have to per our policy, ok?"

61.     Kozal complied.

62.     Waite then searched her purse for her car keys.

63.     Waite did not find anything "suspicious" or illegal on Kozal's person or in her purse or vehicle.

64.     Kozal was arrested for suspicion of driving under the influence of drugs by all three officers acting in together.

65.     The charge is a misdemeanor.

66.     Upon information and belief, since Parish was the officer who stopped Kozal, and the incident allegedly occurred on or near tribal land, he completed the report and was the arresting officer.

67.     Kozal was transported to War Memorial Hospital for a blood draw.

68.     Upon completion of the blood draw, Kozal was then transported to the Chippewa County Jail by Parish and Cameron.

69.     Kozal was extremely upset, crying, confused as this was the first time she had ever been arrested or been in any sort of legal trouble.

70.     Kozal was escorted into the "booking room" Kinsella, and followed into the room by Parish and Cameron

71.    Defendants Vaughn and Luzier, both females, were called to the booking room to conduct a "secondary search" – a strip search.

72.    Vaughn told investigators that none of the arresting officers told her that they had reasonable suspicion that "she was smuggling anything in" to the jail.

73.    According to the investigation, neither Parish, Cameron nor Waite requested a secondary search of Kozal.

74.    Kozal was patted down by Vaughn.

75.    Vaughn was asked by investigators if all inmates are given an opportunity to "turn over" drugs and contraband, including Kozal, and Vaughn replied: "Yes, and she said she didn't – no pockets."

76.    At 2:54:45, Kozal was ordered by Vaughn to move next to the angled "half-wall" and to remove her clothing.

77.    Upon information and belief, either Vaughn or Luzier told Kozal she could not step further back into shower stall, and that she had to undress in the front of the half wall.

78.    The toilet prevented Kozal from stepping further behind the angled wall to provide more protection.

79.    Kozal refused and began crying.

80.    She told Vaughn that she would not get naked in front of the "male cops."

81.    Vaughn told Kozal "that was not an option" and again ordered her to undress.

82.    Vaughn told investigators that she did not instruct the male officers not to look at Kozal because: "[t]hey just know."

83.    Kozal was in clear view of all in the small booking room, including the three males: Parish, Cameron and Kinsella.

84.    Vaughn told investigators that she had no formal training through the County or the Department on how to conduct a strip search and just learned on-the-job.

85.    Cameron was standing at the Datamaster desk directly in front of Kozal.

86.    From the security footage, and from where she was told to stand, the "half-wall" provided no privacy or protection for Kozal.

87.    Kozal was extremely upset, crying and beginning to hyperventilate.

88.    Kozal continued to complain about the men in the room being able to see her naked.

89.    Instead of asking Parish, Cameron and Kinsella to momentarily leave the booking room so she could conduct the strip search, Vaughn told Kozal that the male officers "weren't paying attention to her."

90.    Kozal had no choice but to submit to the strip search by Vaughn and Luzier with Parish, Cameron and Kinsella standing only a few feet away from her.

91.    The security footage partially shows men walking around the room.

92.    During the search, Kozal was ordered to remove all of her clothing.

93.    Vaughn and Luzier than subjected her to a strip search in the presence of the three males in violation of County policy, state law and the United States Constitution.

94.    Kozal was humiliated as Vaughn made her squat and cough twice, a technique used to expel any contraband from her vagina.

95.    Vaughn can be seen directing Kozal to spin around.

96.    At 3:00:29 after being strip searched for approximately six (6) minutes, Kozal can be seen putting on a white tee shirt on behind the half-wall.

97.    Parish told investigators that: "you can see in here if you really want to" and "technically if wanted to see something, you can."

98.    No drugs, contraband, or weapons were found on Kozal.

99.    After the humiliating strip search, Kozal was ordered to call her husband to pick her up 1 ½ hours after being taken to the jail.

100.   Kozal was not provided explanation for why she was being released 1 ½ hours after being booked.

101.   Kozal complained to Bitnar and filed an official complaint against the Defendant deputies.

102.   Defendant Bitnar, according to the records, contacted detectives from Charlevoix and Delta Counties to perform an investigation into Kozal's complaint.

103.   The investigators interviewed the Defendant deputies and inspected the jail and the booking room.

104.   Upon information and belief and according to the investigator's report, the booking room was described as "limited space for officers to complete their work and allow corrections deputies to begin the booking process."[6]

105.   According to the investigator's report, the strip search area was noted as having a "half-wall" that "gives some privacy to a toilet and a shower that is located in the corner of the booking room."

106.   The investigators found: "from the Datamaster and phone it appeared it would be more likely that someone could be observed in the strip search area, and again, depending on how far back the inmate was and how far down the counter the officer was."

107.   The investigators further wrote: "The view from within the strip search area does give the impression that you are exposed to everyone in the room even if that is not the case.  A simple step forward would make the inmate more exposed likewise if they stayed back, they would be les [sic] exposed."

---

[6] Bitner referred the investigation to the Mission Team which is composed of detectives from Delta and Charlevoix Counties.

108.   Predictably, Defendant Kinsella and Parish and Cameron told the investigators they "didn't see anything" – meaning they did not see Kozal naked.

109.   However, all agreed that they could have seen her being strip searched in the small booking room behind the half-wall.

110.   Vaughn told investigators that if she had to do anything differently, she "would have made sure we were back further so was don't have to go through all of this" and "I guess I should have stepped up to keep her back."

111.   When asked the same question, Kinsella said: "I would make the Bay Mills officer come back behind the counter with me so there was no chance he [Cameron] could see anything."

112.   Luzier told investigators that she usually conducts strip searches in the shower stall.

113.   When asked if someone "could be inadvertently seen" being searched, Luzier replied: "shouldn't have been able to seen much" and stated that she "would have done it further back if it would have made her comfortable."

114.   The investigators concluded in their report: "[w]e believe with a few minor changes to the booking procedure including the location of the officers during a search along with an additional of a privacy curtain the chance could be minimized greatly."

115.   The investigators failed to make any determination as to whether the County's strip search policy and procedures were violated by the Defendant deputies.

116.   The investigators failed to make any determination as to whether the Michigan "strip search" statute, MCL §764.25a, a misdemeanor, was violated by the Defendant deputies.

117.   The investigators failed to make any determination as to whether Kozal's complaints were justified.

118.   No one from the County, including Bitnar, notified Kozal of the results of her complaint and/or the investigation.

119.   Upon information and belief, no Defendant deputy was disciplined for violating Michigan Law and the County's strip search policy and procedure.

120.   Upon information and belief, the Defendant County has made no changes to its strip search policy and procedure, including the mandatory requirements of the strip search report.

121.   By failing to properly and fully investigate Kozal's complaints, the County ratified, condoned and tolerating the unconstitutional and unlawful conduct of its deputies.

122.   Upon information and belief, during the arrest, Kozal name was broadcast by Parish over "police scanners."

123.   Despite her numerous telephone calls to the Bay Mills Indian Community Tribal Court, and the tribal prosecutor, Kozal was provided no information about her charges and any impending court date for this misdemeanor charge.

124.   Kozal was never arraigned.

125.   On June 24, 2020, the toxicology report from Kozal's blood test was negative for all controlled and illegal substances, including Klonopin.

126.   Despite her negative blood test results, for three months, Kozal was not provided any information regarding her impending charges.

127.   During this time, her mug shot was posted on various social media accounts.

128.   Her arrest and detention were used against her by the father of her oldest child in a custody hearing as proof that she was an unfit parent.

129.   Kozal's employer terminated her because of her arrest.

130.   However, after "testifying" before the Sault Indian Tribe Board of Directors, Kozal was permitted to return to her job pending the outcome of any criminal proceedings.

131.   Kozal was not allowed to advocate for her client's in court or to conduct home visits; integral parts of her job.

132.   Kozal was not permitted to drive, because she was now deemed "uninsurable" while on the job severely limiting her abilities as an advocate, and her opportunity for advancement.

133.   Kozal was humiliated and disgraced at work as her coworkers no longer treated her the same looking at her with suspicion.

134.   Kozal was ridiculed at her son's hockey games by parents who "heard about" her arrest their kids were not allowed to play with hers.

135.   Kozal believes that she now has a reputation as a "druggy" in her small community.

136.   Upon information and belief, Kozal lost a coveted internship at the Indian Health Center ("IHS") as a result of her arrest, which deprived her of $10,000.00 in student loan forgiveness.

137.   On September 17, 2020, all charges against Kozal were *abandoned* by the Bay Mills Indian Community prosecutor, including any traffic-related civil infractions; the catalyst for all ensuing civil rights violations.[7]

138.   The conduct of the Defendant deputies was objectively unreasonable, shocks the conscience, and violated the Michigan "strip search" statute, County policy and the United States Constitution.

---

[7] Tribal Court Judge, Leah Parish, entered an Order granting the tribal prosecutor's Motion for *Nolle Prosequi* on September 17, 2020.

139.   Defendants, Bitnar, Vaughn, Luzier, Kinsella and Waite, are not entitled to qualified immunity as Kozal's right to be free from unreasonable search and seizure, was unequivocally established by June of 2020.

140.   The Sixth Circuit recognizes a dignitary interest in the privacy component of the Fourth Amendment's proscription against unreasonable searches, including the right not to be subjected to a humiliating strip search in view of others.[8]

141.   Defendants were further on notice that their conduct violated Kozal's constitutional as the County has a specific policy and procedure regarding strip searches.

142.   Defendant deputies failed to intervene and stop the unconstitutional and illegal conduct that resulted in Kozal's damages.

143.   The acts of the Defendant deputies were undertaken in conformity with the customs, policies and practices of the Defendant County's Sheriff Department and administration, subjecting Defendant County, and Bitnar, the final policy maker, to municipal liability for failure to properly hire, train, supervise, monitor, staff and/or discipline the deputies in the Department.

144.   Further, the acts and omissions of the Defendant County, and Bitnar, as the final policy maker, in failing to properly investigate the incident, discipline the

---

[8] *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) (quoting *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir.2002)).

Defendant deputies or modify policies and procedures, ratified the unconstitutional and unlawful conduct.

145.   The acts and omissions, *inter alia*, of the individual Defendant deputies and the supervisors, including Defendant Bitner, leading to municipal liability are as follows:

> a.   Failing to train deputies on how to conduct a lawful arrest after a traffic stop;
>
> b.   Failing to train deputies that that a warrantless arrest requires probable cause;
>
> c.   Failing to train deputies on how to perform FST's;
>
> d.   Ratifying, condoning and encouraging the deputies reporting of false FST's results in order to justify an arrest and seizure;
>
> e.   Failing to train deputies on the County's Strip Search Policy;
>
> f.   Failing to train deputies on Michigan and federal law regarding strip searches;
>
> g.   Ratifying, condoning and encouraging strip searches in the view of the opposite sex in the County jail;
>
> h.   Having an unconstitutional policy, custom or practice of conducting strip searches on all pretrial detainees without a legitimate goal or penological justification;
>
> i.   Having an unconstitutional policy, custom or practice of conducting strip searches on pretrial detainees without articulating reasonable cause for the strip search;
>
> j.   Having an unconstitutional policy, custom or practice of conducting strip searches in view of the opposite sex, without any legitimate or penological justification;

k.    Condoning, authorizing, tolerating and/or ratifying a custom or practice of encouraging and permitting collusive statements by involved deputies and outside law enforcement agencies, including, but not limited to: failing to file complete and accurate reports, filing false reports, making false statements, and obstructing or interfering with an investigation;

l.    Condoning, authorizing, tolerating and/or ratifying a custom or practice of permitting deputies to complete insufficient and incomplete strip search reports in violation of County policy and state law,

m.    Failing to fully and completely investigate and discipline deputies who violated the County's policy and states law regarding strip searches, thereby ratifying the unconstitutional and unlawful conduct, and

n.    Any other custom, policy or practice that becomes known through discovery.

146.    These acts and failures to act pursuant to the customs, policies and practices of the Defendant County, its administration, the Department, and its individual deputies, directly led, and was a moving force, to the unlawful arrest, search and seizure of Kozal, in violation of her Fourth and Fourteenth Amendment rights, giving rise to municipal liability which is not subject to qualified immunity.

## COUNT I

## 42 U.S.C. §1983 – VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS -UNLAWFUL SEARCH AND SEIZURE OF PLAINTIFF

## (AGAINST DEFENDANTS VAUGHN, LUZIER, KINSELLA AND WAITE)

147.    Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully stated herein.

148.    At all times relevant, Kozal had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including her right to personal safety and bodily integrity, as well as protection from unlawful search and seizure pursuant to the Fourth Amendment to the United States Constitution.

149.    The Fourth Amendment states:

> "The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable searches
> and seizures, shall not be violated, and no warrants shall issue,
> but upon probable cause, supported by oath or affirmation,
> and particularly describing the place to be searched, and the
> persons or things to be seized."

U.S. Const., amend. IV.

150.    At all times relevant, the Defendant deputies were acting under color of state law, and were required to obey the laws of the United States including those laws identified under the Fourth and Fourteenth Amendments to the United States Constitution.

151.    In violation of Kozal's clearly established, constitutionally-protected right to be free from an unlawful search and seizure, and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant deputies subjected Kozal to an

unlawful arrest, search and seizure; thereby inflicting horrendous personal injuries upon her.

152.  In violation of Kozal's clearly established, constitutionally-protected right to be free from an unlawful search and seizure, and deprivation of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the to the United States Constitution, Defendant deputies violated Kozal's rights by the following conduct:

a.  Defendant Waite, upon information and belief, unnecessarily performed FST's, or an ARIDE, on Kozal, after Parish promised she could leave if she did not test positive for alcohol;

b.  Defendant Waite, upon information and belief, misrepresented the results of the Kozal's FST's in order to justify her arrest;

c.  Defendant Waite, upon information and belief, conspired with Parish and Cameron to manufacture evidence and detain Kozal, when there was no probable cause to arrest her;

d.  Defendant Waite, upon information and belief, intentionally failed to report the results of her "pat down" and search of K Kozal's purse and  vehicle where no illegal drugs, weapons or contraband were found;

e.  Defendants Vaughn, Luzier fand Kinsella, violated the County's strip search policy and Michigan law by failing to articulate reasonable cause for conducting a strip search on Kozal, who was arrested on misdemeanor charges;

f.  Defendants Vaughn, Luzier fand Kinsella, violated the County's strip search policy and Michigan law by failing to properly and accurately complete a strip search report;

g.    Defendants Vaughn, Luzier fand Kinsella, violated the County's strip search policy and Michigan law by failing to conduct the strip search in a place that prevented the search from being observed by a person or person(s) not conducting or necessary to assist with the search;

h.    Defendants Vaughn, Luzier and Kinsella, violated the County's strip search policy and Michigan law by failing to conduct the strip search out of the presence of male law enforcement officers where there was no penological justification the search in their presence;

i.    Defendants Vaughn, Luzier and Kinsella's conduct in performing the strip search where Kozal's naked body could be seen by male officers was extreme, outrageous and shocks the conscious;

j.    Defendant officers wrote false and misleading reports in an attempt to cover-up and/or obstruct the investigation; and

k.    Any other conduct that becomes known through discovery.

153.   The above conduct in the foregoing Paragraph, was objectively unreasonable, constituted an unreasonable search and seizure and reflected the unnecessary and wanton infliction of pain and suffering, and humiliation and shame on Kozal.

154.   Defendant deputies are not entitled to qualified immunity as Kozal's right to be free from an unlawful search and seizure was clearly established.

155.    In considering the scope of the intrusion on Kozal's right to privacy and bodily integrity, the manner in which the search was conducted, the justification

for search, and the place where it was conducted, Kozal's rights were clearly violated.

156. Pursuant to 42 U.S.C. §§ 1983 and 1988, Defendant deputies are liable to Plaintiff for all damages allowable under federal law and Michigan damages statutes. To the extent that the damages allowable and/or recoverable under one or both statutes are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed to satisfy any and all such in adequacies.

157. As a direct and proximate result of the unconstitutional acts of Defendant deputies as alleged in this complaint, Plaintiff has experienced serious and irreversible psychological damage; Plaintiff has and will incur substantial economic losses including, but not limited to, those in the nature of medical expenses, lost wages, and/or loss of earning capacity; Plaintiff is entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear, shame and mortification, disgrace, loss of reputation, loss of physical and emotional intimacy, loss of self-esteem, and physical manifestations of emotional mental distress such as sleepiness, weight loss, gastro-intestinal discomfort, anxiety and symptoms similar to post-traumatic syndrome.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive

damages in whatever amount the jury may determine, plus costs, interest, and actual

attorney fees.

## COUNT II

## 42 U.S.C. § 1983 – MUNICPAL LIABILITY
## DELIBERATE INDIFFERENCE TO UNCONSTITUTIONAL CUSTOMS, POLICIES AND PRACTICES, SYSTEMATIC FAILURE TO HIRE, TRAIN, SUPERVISE AND DISCIPLINE OFFICERS, AND RATIFICATION OF UNCONSTITUTIONAL ACTS, IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

### (AGAINST DEFENDANTS, COUNTY AND BITNAR)

158.   Plaintiff incorporates by reference each of the allegations contained in

the previous paragraphs as though fully set forth herein.

159.   42 U.S.C. § 1983 states:

> Every person, who under the color of any statute,
> ordinance, regulation, custom, or usage of any state or
> territory or the District of Columbia subjects or causes to
> be subjected any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of
> any rights, privileges or immunities secured by the
> constitution and law shall be liable to the party injured in
> an action at law, suit in equity, or other appropriate
> proceeding for redress . . .

160.   Defendants, County and Bitnar, the final policy-maker, had an

obligation to hire, train, supervise, and monitor, its agents and employees, including

the individual Defendants named herein, to ensure that the constitutional rights of

Kozal and similarly situated citizens were not violated.

161.   Defendants, County and Bitnar, had an obligation to investigate, report and discipline its deputies for unlawful searches and seizures, including the individual Defendants named herein, to ensure that the constitutional rights of Plaintiff and similarly situated citizens were not violated.

162.   Defendants had an obligation to train its deputies to properly effectuate an arrest, perform FST's, report FST results, conduct strip searches and to abide by the County's strip search policy and Michigan law.

163.   With deliberate indifference to the rights of citizens to be free from unlawful and unreasonable searches and seizures, the County and Bitnar have ongoingly condoned, encouraged, tolerated, ratified and acquiesced to a dangerous environment of police and jail misconduct stated in detail in Paragraph one hundred forty-five (145).

164.   Defendant County and Bitnar's acts and omissions were a moving force behind the constitutional violations that caused Plaintiff's injuries and damages in Paragraphs one hundred fifty-seven (157) above.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and award compensatory and punitive damages in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT III

## GROSS NEGLIGENCE, WILLFUL AND WANTON MISCONDUCT CAUSING WRONGFUL DEATH

## (AGAINST THE DEFENDANTS, VAUGHN, LUZIER, KINSELLA AND WAITE)

165.   Plaintiff incorporates by reference each of the allegations contained in the previous paragraphs as though fully set forth herein

166.   Defendants owed Kozal a duty to use ordinary care to ensure her safety and freedom from an unlawful and unreasonable search and seizure, and other harms as described above.

167.   As Kozal had a clearly established right to liberty protected in the substantive components of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including her right to personal safety and bodily integrity, as well as protection from an unlawful and unreasonable search and seizure, pursuant to the Fourth Amendment to the United States Constitution, the Defendant deputies are not entitled to qualified immunity.

168.   Further, the Defendant deputies are not entitled to governmental immunity under Michigan law, MCL §691.1407 *et seq*. as their conduct amounted to gross negligence, and/or willful and wanton misconduct.

169.   Defendant deputies' conduct demonstrated a willful disregard for precautions to ensure Kozal's personal safety and bodily integrity.

170.  Defendant deputies' conduct demonstrated a willful disregard for substantial risk to Kozal.

171.  Defendant deputies breached their duties owed to Kozal and were grossly negligent in that the acts committed by Defendants were done with reckless disregard to Kozal's safety, health, constitutional and/or statutory rights, and with substantial lack of concern to whether an injury resulted to her.

172.  As a direct and proximate result of the unconstitutional acts of Defendant deputies as alleged in this complaint, Plaintiff has experienced serious and irreversible psychological damage; Plaintiff has and will incur substantial economic losses including, but not limited to, those in the nature of medical expenses, lost wages, and/or loss of earning capacity; Plaintiff is entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear, shame and mortification, disgrace, loss of reputation, loss of physical and emotional intimacy, loss of self-esteem, and physical manifestations of emotional mental distress such as sleepiness, weight loss, gastro-intestinal discomfort, anxiety and symptoms similar to post-traumatic syndrome.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and all allowable damages under Michigan law in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## COUNT IV
## FALSE IMPRISONMENT

**(AGAINST THE DEFENDANTS, VAUGHN, LUZIER, KINSELLA AND WAITE)**

125.   Plaintiff incorporated by reference each of the allegations contained in the previous paragraphs as though fully set forth herein.

126.   Kozal was forcibly restrained and detained by Defendant deputies against her will, and deprived of her personal liberty and freedom of movement.

127.   Defendant deputies intended to deprive Kozal of her personal liberty and freedom of movement.

128.   As a direct and proximate result of the unconstitutional acts of Defendant deputies as alleged in this complaint, Plaintiff has experienced serious and irreversible psychological damage; Plaintiff has and will incur substantial economic losses including, but not limited to, those in the nature of medical expenses, lost wages, and/or loss of earning capacity; Plaintiff is entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear, shame and mortification, disgrace, loss of reputation, loss of physical and emotional intimacy, loss of self-esteem, and physical manifestations of emotional mental distress such as sleepiness, weight loss, gastro-intestinal discomfort, anxiety and symptoms similar to post-traumatic syndrome.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in her favor and against Defendants and all allowable damages under Michigan law in whatever amount the jury may determine, plus costs, interest, and actual attorney fees.

## **PRAYER FOR RELIEF**

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

a.   compensatory and consequential damages, allowable under Michigan and federal law;

b.   economic losses on all claims allowed by law;

c.   special damages in an amount to be determined at trial;

d.   punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

e.   attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

f.   pre- and post-judgment interest at the lawful rate; and

g.   any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

Respectfully submitted,

Buckfire Law Firm

By: /s/ *Jennifer G. Damico*
   Jennifer G. Damico (P51403)
   Attorneys for Plaintiff
   29000 Inkster Road, Suite 150
   Southfield, MI  48034
   (248) 569-4646/ fax (248) 569-6737
   jennifer@buckfirelaw.com

February 21, 2021

## **PLAINTIFF'S JURY DEMAND**

Plaintiff, Nicole Lyn Kozal, by and through counsel, demand a trial by jury in the above-captioned matter.

Respectfully submitted,

Buckfire Law Firm

By:/s/ *Jennifer G. Damico*
Jennifer G. Damico (P51403)
Attorneys for Plaintiff
29000 Inkster Road, Suite 150
Southfield, MI  48034
(248) 569-4646/ fax (248) 569-6737
jennifer@buckfirelaw.com

February 21, 2020